**FILED**
**February 11, 2022**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

**Lawyer Disciplinary Board,**
**Petitioner**

**vs)  No. 20-0871**

**Jeffery A. Davis,**
**Respondent**

## MEMORANDUM DECISION

The Lawyer Disciplinary Board ("Board") initiated this lawyer disciplinary proceeding against respondent, Jeffery A. Davis, through a statement of charges filed on November 4, 2020. Following an evidentiary hearing, the Board's Hearing Panel Subcommittee ("HPS") presented its findings and recommended disposition to this Court, concluding that Mr. Davis committed six violations of the West Virginia Rules of Professional Conduct arising from a single disciplinary complaint involving failure to communicate and timely file motions in a privately retained criminal matter. The HPS recommended that Mr. Davis' law license be suspended for a period of six months, one year of supervised practice following reinstatement, and refund of $3,000.00 to the complainant Denver Rucker ("Mr. Rucker"). The HPS also recommended other sanctions including additional continuing legal education classes focusing on law office management and payment of the costs of the proceeding.[1] Mr. Davis objected to the findings and recommendation of the HPS; accordingly, this Court scheduled the matter for oral argument with briefs to be submitted by the parties in support of their respective positions.[2]

This Court has now carefully considered the briefs and oral arguments of the parties, the submitted record, and the pertinent authorities. Upon review, we find that the record supports the findings and recommendation of the HPS, and accordingly, we impose the recommended sanctions as set forth below. Because there is no substantial question of law and no prejudicial error, a memorandum decision is appropriate pursuant to Rule 21 of the West Virginia Rules of Appellate Procedure.

---

[1] The HPS further expressly recommended that Mr. Davis be required to comply with the provisions of Rule 3.28 of the West Virginia Rules of Lawyer Disciplinary Procedure, which outlines the required notice to clients when an attorney is suspended and the filing of an affidavit of compliance—a requirement with which Mr. Davis did not comply in a prior disciplinary matter. *See infra* n.8.

[2] The Board is represented by Rachael L. Fletcher Cipoletti, Esq., Chief Lawyer Disciplinary Counsel and Mr. Davis is self-represented.

1

## I. Factual and Procedural History

Mr. Davis, who was admitted to the West Virginia State Bar in 1993, practices in Spencer, West Virginia. He has been the subject of seven prior disciplinary sanctions.[3] As to the instant complaint, in November 2017, complainant Mr. Rucker was indicted in Clay County on multiple counts stemming from an incident where he was discovered to be manufacturing a controlled substance and engaged in wanton endangerment with a firearm and destructive, explosive or incendiary devices. He and/or his wife retained Mr. Davis to represent him.[4] Mr. Rucker pled guilty to three counts, with the remaining counts dismissed, and was sentenced in March 2018. He was sentenced to one to five years on the manufacturing charge, five years for wanton endangerment with a firearm, and two to ten years for wanton endangerment involving destructive devices.

In October, 2018, Mr. Rucker inquired of the Clay County Circuit Clerk as to whether Mr. Davis had filed a motion for reconsideration of his sentence, noting that "[c]ommunication with my attorney has broken down[.]" Mr. Rucker then wrote to Mr. Davis advising that the motion had not been filed although "[y]ou had stated to my wife that this had been done" and inquiring about a motion for "return of my property and any non-contraband items" which had also allegedly been discussed. Mr. Rucker's letter further requested that since their attorney-client relationship "may be at an end," the "original copy of [the] client file" be returned to him. On December 6, 2018, Mr. Rucker filed a complaint with ODC for Mr. Davis' failure to file the motions for reduction of sentence and return of property and failure to return his file.

On January 14, 2019, Mr. Davis responded to the complaint stating that he did discuss the motions with Mr. Rucker's wife, almost weekly, due to Mr. Rucker's poor health. Mr. Davis indicated that he had indeed been pursuing return of the property, but the West Virginia State Police commander was on leave. Mr. Davis further indicated that he determined that a motion for compassionate release was a "better option" than a motion for reduction of sentence given Mr. Rucker's poor health. He indicated he did not "get in a rush" to return the file as requested because he wanted to finish the motion and obtain Mr. Rucker's property. Mr. Rucker replied to Mr. Davis' response by stating that Mr. Davis had not returned his wife's phone calls and that he had not received his client file or a copy of a motion for compassionate release. ODC sent two letters to Mr. Davis in February and March 2019 inquiring about the status of the motions, to which it received no response until April 30, 2019, with a copy of a motion filed on April 10, as described below.

---

[3] From 2007 to 2019, Mr. Davis was admonished on six occasions and received one suspension for thirty days. He was also warned on these occasions for issues including conflicts of interest, diligence, client communication, fees, terminating representation, and inaccurate billing. In all but one of these disciplinary matters, Mr. Davis was admonished for not timely responding to the Office of Disciplinary Counsel ("ODC").

[4] Mr. Davis was initially court-appointed to represent Mr. Rucker, however, it was later discovered that he was not eligible for court-appointed counsel and the Ruckers privately retained him. Mr. Davis maintains that Mr. Rucker was hospitalized "in an induced coma" at the time he was retained, and that Mr. Rucker's wife executed the fee agreement.

On April 10, 2019, Mr. Davis filed a "motion" without more specific caption, asserting that Mr. Rucker was suffering from multiple ailments including lung cancer which necessitated surgery and that because of these "exigent circumstances" the circuit court should "reduce or modify" Mr. Rucker's sentence. The motion did not contain the words "compassionate release," or cite any statutory or common law authority for such release. The following day, the court denied the motion as untimely pursuant to Rule 35(b) of the West Virginia Rules of Criminal Procedure, which requires a motion for reduction of sentence to be filed within 120 days of sentencing.[5] The court noted, however, that it was "of the opinion that the sentence imposed herein is in the proper administration of justice."[6] Over two months later, by letters dated June 21, 2019, Mr. Davis notified Mr. Rucker that the motion was denied and advised ODC that Mr. Rucker had been provided a copy of his file, respectively.

On July 1, 2019, ODC requested a copy of the fee agreement with Mr. Davis from Mr. Rucker, who had no such document, although he provided two receipts totaling $7,000, with a handwritten note stating, "no written agreement." ODC further inquired about the status of the motion for return of property, but Mr. Rucker advised it had not been filed. Mr. Rucker also provided a news article indicating that Mr. Davis had been suspended for thirty days on June 17, 2019.

On July 22, 2019, ODC requested a copy of the fee agreement from Mr. Davis, who did not respond. After another request was sent on August 27, 2019, Mr. Davis responded stating that he could not locate a fee agreement but recalled that one was signed by Mr. Rucker's wife, on his behalf, at the hospital; Mr. Davis provided a blank agreement that he typically utilized.

On November 4, 2020, a formal statement of charges was filed against Mr. Davis upon which a hearing before the HPS was held on April 14, 2021; Mr. Davis and Mr. and Mrs. Rucker testified. Based upon this testimony and other evidence, the HPS found that Mr. Davis: 1) failed to communicate with the Ruckers about the subject motions and missed the deadline for a motion to reconsider; 2) never advised the Ruckers that he filed a motion for compassionate release and failed to frame the motion as such; 3) failed to timely advise the Ruckers the motion had been denied; 4) never filed a motion to return personal property; 5) did not timely return Mr. Rucker's file; 6) failed to have the Ruckers sign a fee agreement; and 7) did not timely respond to ODC's request for the fee agreement. As a result, the HPS determined that Mr. Davis violated West Virginia Rules of Professional Conduct 1.3 (diligence), 1.4(a) and (b) (communication with client), 1.5(b) (fees), and 8.4(d) (conduct prejudicial to administration of justice) in his representation of Mr. Rucker and Rule 8.1(b) (failure to respond to demand for information from disciplinary authority) for failing to timely respond to ODC's request for the fee agreement.

---

[5] West Virginia Rule of Criminal Procedure 35(b) provides, in part: "A motion to reduce a sentence may be made, or the court may reduce a sentence without motion within 120 days after the sentence is imposed[.]"

[6] The order also incorrectly noted that a prior motion for reduction of sentence had been denied; this error was corrected by amended order, which amended order then omitted the court's opinion about the propriety of the sentence.

The HPS found these violations to be knowing, particularly with respect to his failure to respond to ODC given his multiple admonishments and prior thirty-day suspension for failure to respond to ODC. The HPS found these violations demonstrably harmed Mr. Rucker who was denied reconsideration of his sentence[7] and further harmed the legal profession because of the lack of support experienced by Mrs. Rucker. With regard to aggravation and mitigation, the HPS found no mitigating factors, but four aggravating factors: 1) Mr. Davis' seven prior disciplinary sanctions; 2) a pattern of misconduct, referencing Mr. Davis' prior admonishments/suspension for failure to respond to ODC;[8] 3) the vulnerability of the victim, noting Mr. Rucker's poor health and incarceration; and 4) Mr. Davis' substantial experience—twenty-eight years—in the practice of law.

In considering the proper sanction, the HPS observed that from 2007 to date, Mr. Davis continued to commit similar misconduct and that his prior thirty-day suspension had not rectified his behavior. As such, it recommended a six-month suspension with one year of supervised practice. It further recommended an additional twelve hours of CLE, refund of $3,000 to the Ruckers, and payment of costs.

Mr. Davis objects to the recommendation, arguing that the six-month suspension is excessive and requests that the Court reject the HPS's findings that he committed knowing and willful violations. The Board requests the Court to adopt the recommendation of the HPS.

## II. Standard of Review

It is well-established that "[t]his Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syl. Pt. 3, *Comm. on Legal Ethics v. Blair*, 174 W.Va. 494, 327 S.E.2d 671 (1984). With respect to the HPS's findings:

> A *de novo* standard applies to a review of the adjudicatory record made before the [HPS] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [HPS's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the

---

[7] Substitute counsel for Mr. Rucker thereafter filed a motion to have Mr. Rucker resentenced for purposes of then timely filing a motion for reduction of sentence; this motion was denied and appealed to this Court, which affirmed the circuit court's denial. *See State v. Rucker*, No. 20-0615, 2021 WL 3833872 (W. Va. Aug. 27, 2021) (memorandum decision). Mr. Rucker was ultimately paroled in November 2020 and has since passed away.

[8] As to the pattern of misconduct, HPS specifically noted that when Mr. Davis was previously suspended for thirty days, he failed to file an affidavit pursuant to Rule 3.28(c) indicating he had advised clients that he was suspended; the Rule provides that failure to do so "shall constitute an aggravating factor in any subsequent disciplinary proceeding." *See* W. Va. R. Law. Disciplinary P. 3.28(a).

[HPS's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record.

Syl. Pt. 3, *Legal Ethics of W. Va. v. McCorkle*, 192 W.Va. 286, 452 S.E.2d 377 (1994). With these standards in mind, we consider the HPS's findings and recommended discipline.

### III. Discussion

Mr. Davis challenges both the HPS's factual findings and recommended discipline. He offers a variety of explanations for his actions in Mr. Rucker's case, highlighting the relatively unusual posture of defending Mr. Rucker while he was hospitalized for some portion of the proceedings necessitating a great deal of coordination with Mrs. Rucker. We observe that "Rule 3.7 of the Rules of Lawyer Disciplinary Procedure . . . requires the Office of Disciplinary Counsel to prove the allegations of the formal charge by clear and convincing evidence." Syl. Pt. 1, in part, *Law. Disciplinary Bd. v. McGraw*, 194 W. Va. 788, 461 S.E.2d 850 (1995).

First, with regard to his failure to timely file a motion for reduction of sentence, Mr. Davis contends that such a motion would have been "fruitless" given that the circuit court was "very stern" with Mr. Rucker at sentencing. Mr. Davis notes that in the order denying the motion which he ultimately filed, the court reiterated that the sentence was "in the proper administration of justice" and therefore confirms his belief that a motion for reduction of sentence would have been pointless. He maintains that Mr. and Mrs. Rucker were agreeable to a motion for compassionate release in lieu of a motion for reduction of sentence and that he advised Mrs. Rucker that waiting until Mr. Rucker's health issues had "peaked" was preferable in that regard.[9] As to the motion for return of property, Mr. Davis now argues that he was advised that the non-contraband items were still being investigated and therefore a motion for return would be equally "fruitless."

As to Mr. Rucker's request to have his file returned, Mr. Davis contends that the Ruckers had copies of everything in the file inasmuch as Mrs. Rucker visited his office weekly at which time she was given copies. He argues that the demand for the file was worded as a termination of the attorney/client relationship and that after speaking with Mrs. Rucker and developing the plan

---

[9] Mr. Davis, in fact, states that it was Mrs. Rucker "who did additional research and suggested a Motion for Compassionate Release as an alternative to the Motion to Reconsider[.]" We note that while the federal criminal justice system and certain states have enacted "compassionate release" laws, West Virginia has no such mechanism for reduction or modification of sentence. *See* 18 U.S.C. § 3582(c)(1)(A) (2018); *see also State v. Garland*, No. 20CA3923, 2021 WL 2163546 at *2 (Ohio Ct. App. May 26, 2021) ("[W]e note that the compassionate release provisions and the federal cases he cites apply to offenders who have committed *federal* crimes, have been sentenced in *federal* court, and are serving time in *federal* prisons. They are not applicable to Garland's *state* criminal proceedings."); *People v. Harris*, 117 N.E.3d 225, 229 (Ill. App. Ct. 2018) ("Illinois law does not provide for this type of compassionate release program, and we are without authority to apply the federal compassionate release standards to an Illinois case.").

to move for compassionate release, he believed the termination had been rescinded.[10] Therefore, he did not return the file immediately.

Finally, as to the fee agreement and lack of response to ODC requesting it, Mr. Davis notes that he moved his office from Clay to Spencer in August/September 2019, "complicat[ing]" his search for the fee agreement. Mr. Davis insists that he provided the fee agreement to Mrs. Rucker at the hospital for signature and assumed she returned it to his office despite his inability to locate it. Noting further that this is the same general timeframe in which the original July 22, 2019, letter from ODC requesting the fee agreement was sent, he denies receiving it and highlights his timely response to ODC's follow-up letter.

In short, Mr. Davis denies any failure of diligence or communication, but blames the unusual circumstances necessitating communication through Mrs. Rucker due to Mr. Rucker's hospitalization. He insists that Mrs. Rucker was in his office weekly and had "frequent" communication with her, even at church where they both attended. He argues that his strategy with regard to the motion for reduction of sentence was proven correct and that the request to return the file was obviated by Mrs. Rucker's insistence that he continue to represent Mr. Rucker. As to the Ruckers' purported dissatisfaction with his representation, Mr. Davis notes that Mr. Rucker testified simply that he wished he had taken the matter to trial, rather than entering a plea— none of which goes to the allegations against him. He notes Mrs. Rucker complained merely that she needed "someone to lean on" and that he was not always available for her desire for "constant contact."

While the Court is not unsympathetic to the expediencies of a busy criminal practice, we believe that Mr. Davis' actions and "strategies" plainly failed to comport with his obligations under the West Virginia Rules of Professional Conduct. Mr. Davis' insistence that the motion he filed was a strategic effort undertaken with the Ruckers' consent is belied by the fact that the motion he ultimately filed nowhere requested or even referenced "compassionate release." This failure to so frame the motion permitted the circuit court to understandably characterize it as an untimely motion for reduction of sentence and deny it summarily. *But see, supra* n.9. Indeed, the Ruckers' correspondence and testimony fails to reflect any contemporaneous or *timely* awareness that a motion had been filed or denied, and Mr. Davis failed to provide the HPS or this Court any evidence to the contrary.[11] Even Mr. Davis' *best* evidence shows that he failed to advise the

---

[10] Mr. Davis further states that Mrs. Rucker advised him that someone at the correctional facility had actually completed the ethics complaint and Mr. Rucker merely signed it "not fully realizing what it was" but "assured [Mr. Davis] that [Mr. Rucker] wanted him to continue representation[.]"

[11] Although not well-developed in the record, certain inconsistent representations raise the issue of whether Mr. Davis adequately and timely advised Mr. Rucker regarding the availability and relative merits of a Rule 35(b) motion, in contrast to his position that a Rule 35 motion was strategically rejected. Mr. Davis indicates that after sentencing, he had "weekly" discussions with Mrs. Rucker about a motion for compassionate release due to Mr. Rucker's failing health as an alternative to a Rule 35 motion. However, in his June 21, 2019, letter to Mr. Rucker advising that (continued . . .)

Ruckers that a motion which they had ostensibly been requesting for over a year had even been filed and that he waited over two months to notify Mr. Rucker the motion was denied.

Indeed, even after receiving Mr. Rucker's complaint and inquiries from ODC, Mr. Davis' communication and diligence in this matter did not improve. While he may have believed that return of the file was obviated by Mrs. Rucker's insistence that he proceed with the motion, he did not confirm this with either Mr. or Mrs. Rucker and did not provide them with a copy of the file until approximately eight months after Mr. Rucker's request. Further, while Mr. Davis insists that he was essentially "working on" return of Mr. Rucker's non-contraband property, he never filed a motion for return of the property as requested and provides no evidence that he ever advised either Mr. or Mrs. Rucker of the status of his informal efforts, even after he purportedly concluded the property would not likely be returned due to additional investigation. Finally, Mr. Davis' unsubstantiated contention that isolated inadvertence or oversight occasioned by his office relocation adequately explains his failure to locate a fee agreement or timely respond to ODC rings hollow in view of his history in this case, as well as over the past several years. We therefore agree that Mr. Davis committed each violation of the Rules of Professional Conduct as determined by the HPS.

As to the HPS's recommended sanction, we are guided by Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure which provides:

> In imposing a sanction after a finding of lawyer misconduct, unless otherwise provided in these rules, the Court or Board shall consider the following factors: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors.

*See also* Syl. Pt. 4, *Off. of Law. Disciplinary Couns. v. Jordan*, 204 W. Va. 495, 513 S.E.2d 722 (1998). Mr. Davis largely reiterates his defenses to the Rules violations found by the HPS as to these factors, focusing on the lack of demonstrable prejudice to Mr. Rucker in the final analysis. He argues that even a timely motion for reduction of sentence or return of property would have undoubtedly failed and that his informal communications with Mrs. Rucker were more than adequate.

---

the motion had been denied, Mr. Davis stated that the motion was filed "due to medical conditions that arose *after* the 120-day time limit required by Rule 35(b)." (emphasis added). Further, Mr. Davis repeatedly states in his defense that Mr. Rucker made no "formal request" for such a motion until after the 120-day limitation had passed and he had no "automatic duty" to file such a motion. These statements certainly cast doubt on Mr. Davis' contention that he did not miss the deadline for a Rule 35 motion, but timely discussed and strategically opted for a much later-filed motion based upon Mr. Rucker's failing health, which motion cited no underlying authority.

First, we have little difficulty agreeing with the HPS's conclusion that Mr. Davis' actions violated duties to not only his client Mr. Rucker, but to the legal system and profession as a whole. Mr. Davis' failure to diligently pursue relief for Mr. Rucker and keep him apprised of the status of his efforts—all while Mr. Rucker remained not only incarcerated but occasionally hospitalized and in failing health—plainly violated the very essence of his representation. Mr. Davis' ostensible disregard of procedural deadlines and proper motions practice reflects poorly on both the legal system and profession. Notably, it was while attempting to obtain redress from ODC that Mr. Rucker learned through the local newspaper that his lawyer had been suspended for thirty days, and that "ethic [sic] violations are his norm." Plainly, Mr. Rucker should not have had to learn that his attorney had been suspended in this manner, particularly while he was attempting to compel him to take action on his behalf. *See supra* n.8. This unfortunate confluence of events tarnishes the entire legal profession.

We further agree with the HPS that Mr. Davis' actions were knowing. Mr. Davis suggests that discussions with Mrs. Rucker regarding an alternative to a motion for reduction of sentence commenced within the timeframe for filing such a motion and occurred "weekly" but was abandoned in favor of a compassionate release motion. Nonetheless, no motion was filed until over one year later—well after Mr. Rucker had filed an ethics complaint about this specific issue, after ODC had inquired about the motions, and despite what even Mr. Davis concedes was Mrs. Rucker's frequent contact in that regard. Similarly, Mr. Davis failed to provide Mr. Rucker's file until approximately eight months after it was requested and never filed a motion in regard to the property return, both of which were highlighted in the ethics complaint. *See Law. Disciplinary Bd. v. Palmer*, 238 W. Va. 688, 697, 798 S.E.2d 610, 619 (W. Va. 2017) ("By virtue of the ethics complaint initiated by his client, Mr. Palmer also knew of Mr. Allen's concerns about his lack of communication. Nevertheless, Mr. Palmer remained uncommunicative. Thus, Mr. Palmer's actions were both knowing and negligent."). Moreover, Mr. Davis offers no explanation for his failure to respond to ODC's request for the fee agreement, other than a blanket denial that he received the request. In view of Mr. Davis' history of admonishments for failure to respond to ODC, we have little difficulty finding these violations to be intentional as well.

As to Mr. Davis' arguments regarding the lack of any actual prejudice to Mr. Rucker, we find them similar to those this Court rejected in *Palmer*, 238 W. Va. 688, 798 S.E.2d 610. In *Palmer*, the attorney missed multiple deadlines pertaining to his client's habeas petition and failed to keep him apprised of the status. *Id*. at 696-697, 798 S.E.2d at 618-19. The attorney argued that his omissions were mitigated by his ultimate success in filing the submissions late. *Id*. at 696, 798 S.E.2d at 618. Rejecting the attorney's "no harm done" arguments, this Court noted:

> Although Mr. Palmer characterizes his inaction as inconsequential
> and easily cured, he fostered his earlier lack of communication by
> making no effort to advise Mr. Allen of the missed deadline or of
> his belief that the situation could be easily remedied. Meanwhile,
> Mr. Allen remained in prison with no idea what, if any, progress was
> being made in his *habeas* case.

*Id*. at 696-97, 798 S.E.2d at 618-19. However, unlike *Palmer*—in which the lawyer's actions merely served to *delay* the proceedings—Mr. Davis' inaction caused Mr. Rucker to forfeit his

8

ability to request a reduction or modification of his sentence altogether. As this Court stated in *Lawyer Disciplinary Board v. Sturm*, 237 W. Va. 115, 785 S.E.2d 821 (2016), while Mr. Rucker's "'odds of [] success may have been slim, he will never know with certainty whether he would have [had] success[,]' because his attorney did nothing." *Id*. at 127, 785 S.E.2d at 833.

Finally, Mr. Davis offers no discernable argument in regard to the aggravating circumstances found by the HPS—his prior disciplinary offenses, pattern of misconduct, vulnerability of the victim, and his substantial experience in the practice of law—nor the absence of any mitigating circumstances. Instead, Mr. Davis argues that a six-month suspension is excessive under the facts and that such a lengthy suspension would detrimentally impact the legal community he serves in Roane and Calhoun counties. Arguing that because there are only a "handful" of attorneys in these counties, he maintains that a six-month suspension would "limit the availability to the public of legal counsel" and "place a hardship on the public" requiring them to "travel[] outside the area to obtain legal counsel" and would result in "higher fees than what is common in rural areas."[12]

While we applaud Mr. Davis' concern for the legal needs of his community, it is the need to protect this very community that requires the Court to adopt the HPS's recommended six-month suspension. Critically, it is not merely the events underlying this particular complaint which justify a six-month suspension, but Mr. Davis' considerable history of virtually identical professional shortcomings. This Court has explained that "[a]ttorney disciplinary proceedings are not designed solely to punish the attorney, but rather to protect the public, to reassure it as to the reliability and integrity of attorneys and to safeguard its interest in the administration of justice." *Law. Disciplinary Bd. v. Taylor*, 192 W. Va. 139, 144, 451 S.E.2d 440, 445 (1994).

Further, we are not unmindful of the fact that many of the events underlying Mr. Rucker's complaint occurred at a time that Mr. Davis was already engaged in a separate disciplinary matter and serving a thirty-day suspension. *See Law. Disciplinary Bd. v. Sullivan*, 230 W. Va. 460, 463, 740 S.E.2d 55, 58 (2013) ("Respondent pledged to the ODC, and to the Board, that he would be more diligent in representing his clients. However, the record shows that *at the same time he was making this pledge*, the Respondent was ignoring repeated requests from Mr. White and Mr. White's family to take that action necessary to correct a facially inaccurate sentencing order."). Despite the gravity of this suspension, Mr. Davis demonstrated no apparent intention to undertake a more diligent and responsive practice. Accordingly, in view of Mr. Davis' history of disciplinary offenses and seven prior sanctions including a thirty-day suspension, we find that a six-month suspension is consistent with this Court's obligation to protect the public interest and dissuade similar conduct in the future. *Cf. Palmer*, 238 W. Va. 688, 798 S.E.2d 610 (issuing ninety-day suspension where attorney had only three prior admonishments and no prior suspensions); *Sturm*, 237 W. Va. at 129, 785 S.E.2d at 835 (issuing ninety-day suspension citing "ineffectiveness" of prior two admonishments); *Sullivan*, 230 W. Va. 460, 740 S.E.2d 55 (issuing thirty-day suspension where attorney had five prior admonishments); *Law. Disciplinary Bd. v. Aleshire*, 230 W. Va. 70,

---

[12] Mr. Davis cites to Mrs. Rucker's testimony that she contacted fifteen to twenty attorneys to represent her husband prior to Mr. Davis, who quoted retainers in the range of $25,000-$75,000; Mr. Davis represented Mr. Rucker for $10,000.

79-80, 736 S.E.2d 70, 79-80 (2012) (imposing one-year suspension where attorney demonstrated "a consistent unwillingness" to respond to ODC).

For the reasons stated above, we concur in the recommendation of the HPS and order that Mr. Davis' law license be suspended for a period of six (6) months and that upon his reinstatement, he be placed on one (1) year of supervised practice by an active attorney in his geographic area in good standing with the West Virginia State Bar and as agreed upon by ODC. We also order that Mr. Davis be required to complete an additional twelve CLE hours in law office management in addition to the twenty-four hours already required of him by the West Virginia State Bar, with the additional twelve hours to be completed within a year from the date of his suspension; that he comply with the mandates of Rule 3.28 of the Rules of Lawyer Disciplinary Procedure; that he refund $3,000.00 to Mrs. Rucker;[13] and that he pay the costs of the disciplinary proceedings pursuant to Rule 3.15 of the Rules of Lawyer Disciplinary Procedure.

Law license suspended and other sanctions imposed.

**ISSUED**: February 11, 2022

**CONCURRED IN BY**:

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice William R. Wooton

**NOT PARTICIPATING:**

Justice Alan D. Moats sitting by temporary assignment[14]

---

[13] *See infra* n.7 (regarding Mr. Rucker's passing).

[14] Pursuant to an administrative order entered by this Court on February 7, 2022, the Honorable Alan D. Moats, Judge of the Nineteenth Judicial Circuit, was assigned to sit as a member of the Supreme Court of Appeals of West Virginia commencing February 7, 2022, due to the resignation of Justice Evan H. Jenkins, effective February 6, 2022.